UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIFFANY L CHAPMAN,

   Plaintiff,

 v.           Civil Action 2:18-cv-258
               Chief Judge Edmund A. Sargus, Jr.
               Magistrate Judge Jolson

COMMISSIONER OF
SOCIAL SECURITY,

   Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Tiffany L Chapman, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her Supplemental Security Income and Disability Insurance Benefits. For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I. BACKGROUND

#### A. Prior Proceedings

Plaintiff applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") in June 2014, alleging disability due to a number of mental and physical impairments. (Tr. 199–211, PAGEID #: 248–260). Plaintiff alleged an onset date of January 1, 2013. (*Id.*).

After initial administrative denials of Plaintiff's claims, Administrative Law Judge Gregory Moldafsky ("the ALJ") heard the case on February 21, 2017. (Tr. 39–86, PAGEID #: 88–135). The ALJ then issued a decision, finding that Plaintiff was not disabled within the

meaning of the Social Security Act. (Tr. 15–28, PAGEID #: 64–77). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3, PAGEID #: 50–52).

Plaintiff filed this case on March 27, 2018, and the Commissioner filed the administrative record on May 31, 2018. (Doc. 8). Plaintiff filed a Statement of Specific Errors on July 13, 2018 (Doc. 9), an Amended Statement of Specific Errors on July 25, 2018 (Doc. 10). The Commissioner responded on August 24, 2018 (Doc. 11) and Plaintiff replied. (Doc. 12).

### B. Relevant Hearing Testimony

At the hearing, Plaintiff testified that she was born in 1979 and was 33 years old on her alleged onset date. (*Id.*, Tr. 43, PAGEID #: 92). Plaintiff testified that she suffers from anxiety, nightmares, and depression. (*Id.*, Tr. 45–47, PAGEID #: 94–96). She further explained that it is "hard for [her] to be around people," that socializing "drains" her, and that she avoids going out in public. (*Id.*, Tr. 45–46, PAGEID #: 94–95). Plaintiff testified that much of her anxiety stems from her history of domestic violence, which causes her not to trust people. (*Id.*, Tr. 45, PAGEID #: 94). All of this, Plaintiff explained, causes her body to "shut down," preventing her from working. (*Id.*, Tr. 47, PAGEID #: 96).

As to Plaintiff's work and educational history, Plaintiff earned her associate degree in 2014 and received her bachelor's degree in psychology in 2016. (*Id.*, Tr. 44–45, PAGEID #: 93–94). She testified that she received strong grades in her associate's program but struggled to focus while working towards her online bachelor's degree. (*Id.*, Tr. 75–76, PAGEID #: 124–25). Plaintiff's longest-held job was as a custodian. (*Id.*, Tr. 48–49, PAGEID #: 97–98). Prior to that, Plaintiff worked as a mail sorter and in the fast food industry. (*Id.*, Tr. 50–55, PAGEID #: 99–104).

Plaintiff testified that she takes medications for asthma, thyroid issues, cholesterol, anxiety, depression, and difficulty sleeping. (*Id*., Tr. 58, PAGEID #: 107). Plaintiff explained that it is her mental health—not physical issues— preventing her from working. (*Id*.). When asked about the effectiveness of her medications, Plaintiff testified that her medications "do what they can do," but that she still gets anxious and depressed. (*Id*., Tr. 60, PAGEID #: 109). She explained that her symptoms, such as her nightmares, are generally "triggered" by personal events in her life. (*Id*.). Plaintiff is "trying to learn ways to express [her] anxiety," but ultimately, "there is no magic pill that's going to get rid of everything that [she's] been through." (*Id*., Tr. 60–61, PAGEID #: 109–10).

In terms of daily activities, Plaintiff testified that she takes care of her two children living with her. (*Id*., Tr. 61–62, PAGEID #: 110–11). She takes the bus to attend appointments or other events and either walks or takes a cab to the grocery store. (*Id*., Tr. 61, PAGEID #: 110). Plaintiff testified that she finds grocery shopping difficult and tiring. (*Id*.). She also testified that she attends her family member's events, takes her children to doctor appointments, cares for her dog, prepares meals for her family, and tends to housework (albeit, at a slow pace). (*Id*., Tr. 63–67, PAGEID #: 112–114). Plaintiff explained that, because of her anxiety, she does not like to leave the house. (*Id*., Tr. 63, PAGEID #: 112). When the ALJ asked her to describe her typical day, Plaintiff answered that she "usually just hang[s] out on the couch," plays word games on her phone, watches TV, talks to her boyfriend, and plays with her dog. (*Id*., Tr. 64–66, PAGEID #: 113–115). She further testified that on a "good day" she does as much as she can, and that her children and boyfriend help her with yardwork and other household chores. (*Id*., Tr. 67, PAGEID #: 116). Plaintiff also testified that she ensures her children finish their homework and frequently communicates with her daughter's teacher. (*Id*., Tr. 68, PAGEID #: 117). Plaintiff travels with

her family to visit her mom once or twice a year, and Plaintiff's father visits her on holidays. (*Id.*, Tr. 67, PAGEID #: 116).

As to Plaintiff's hobbies and interests, Plaintiff serves as a Facebook administrator for an "art group for people to share like therapy purposes to try to encourage people with like anxiety or depression or whatever to do like art to help them feel better." (*Id.*, Tr. 68, PAGEID #: 117). Plaintiff also spends her time coloring, sewing, playing with her dogs, spending time with her boyfriend, and playing word games on her phone. (*Id.*, Tr. 64–65, PAGEID #: 113–14). She told the ALJ that studying psychology is her "passion." (*Id.*, Tr. 76, PAGEID #: 125).

At the hearing, Plaintiff's attorney presented a calendar that Plaintiff created, which illustrates the amount of time Plaintiff feels anxious and depressed during a typical week. (*Id.*, Tr. 70–72, PAGEID #: 119–21). When Plaintiff's attorney asked her how her anxiety, nightmares, and depression affect her ability to work, Plaintiff testified that, following a nightmare, she feels anxious to leave the house, and cries. (*Id.*, Tr. 71–72, PAGEID #: 120–21). In response to questioning by her counsel, Plaintiff stated that she has "gotten in trouble before for crying at work." (*Id.*, Tr. 72, PAGEID #: 121).

During the hearing, a vocational expert ("VE") opined that in addition to being able to perform some past work, Plaintiff could also perform the medium and unskilled positions of "cleaner" and "laundry worker." (*Id.*, Tr. 80–81, PAGEID #: 129–30).

**C. Relevant Medical Background**

The medical records show medication management and counseling services for anxiety and depression. Records from January 18, 2013, show that Plaintiff reported anxiety stemming from domestic problems with her son and related feelings of guilt and self-blame. (Doc. 8, Tr. 337, PAGEID #: 386; *id.*, Tr. 343, PAGEID #: 392). Her mental status exam at that time showed

anxious mood and stress related to her loss of her relationship with her son but was otherwise unremarkable. (*Id*., Tr. 345, PAGEID #: 394). Records from May 6, 2013, note that Plaintiff experienced an increase in symptoms after her son was expelled for allegedly bringing a gun to school. (*Id*., Tr. 319, PAGEID #: 368). On May 30, 2013, records indicate that Plaintiff graduated from her degree program with a 3.5 GPA and note symptom improvement with medication compliance. (*Id*., Tr. 321, PAGEID #: 370).

In January and February 2014, Plaintiff reported fairly controlled depression symptoms, with a good response to medication, and only a single instance of noted constricted affective and anxious and depressed mood. (*Id*., Tr. 419–30, PAGEID #: 468–79). In May 2014, however, Plaintiff was discharged from her housing program and consequently experienced an increase in reported anxiety symptoms. (*Id*., Tr. 406–09, PAGEID #: 455–58). Records note that Plaintiff has strong coping and problem-solving skills and knowledge of how to access resources. (*Id*., Tr. 410, PAGEID #: 459). Subsequent records show reports of symptom improvement after Plaintiff successfully enrolled her son in treatment and consistently took her medications. (*Id*., Tr. 336–37, PAGEID #: 385–86). These records also show that Plaintiff was able to attend school and study psychology, maintain a grade point average ("GPA") above 3.0, and attend church. (*Id*.).

On October 7, 2014, Plaintiff underwent a psychological consultative examination with Steven Meyer, Ph.D., in which Plaintiff reported a history of anxiety and depression. (*Id*., Tr. 350–56, PAGEID #: 399–405). Her mental status exam was notable for a tense posture, mild impulsivity, with a mildly dysphoric, anxious and irritable mood. (*Id*., Tr. 353, PAGEID #: 402). Dr. Meyer diagnosed Plaintiff with depressive disorder (not otherwise specified), PTSD, personality disorder (not otherwise specified), and assessed a GAF of 61. (*Id*., Tr. 345, PAGEID #: 403). He also indicated he expected Plaintiff to be able to do the following:

perform simple and moderately complex routine instructions and tasks, in a work setting without strict production quotas or pace requirements, with some additional assistance available as needed at times of learning and performing new tasks, in a solitary work setting with at most only intermittent/occasional contact with supervisors and co-workers, in a low stress work setting with some additional assistance available as needed at times of change in routine.

(*Id.*, Tr. 355–56, PAGEID #: 404–05).

Records, dated 2015 and 2016, from Ohio Guidestone Foster Care and Family Services show that Plaintiff continued outpatient counseling services and reported continued stress due to legal and behavioral problems concerning her children. (*See generally id.*, Tr. 451–508, PAGEID #: 500–57). These records also indicate major functional impairment in the areas of work occupation, family relations, social judgment, thinking, and mood. (*Id.*, Tr. 454–55, PAGEID #: 593–94). The records note, however, that Plaintiff "has also been able to reduce her anxiety and has been able to go out with others to do things that she enjoys." (*Id.*, Tr. 471, PAGEID #: 530). Further, the records show that Plaintiff was able to engage with both mental health and legal services for her children, prepare a resume, search for a job, and interview (albeit with limited success). (*See generally id.*, Tr. 451–508, PAGEID #: 500–57). As noted by the ALJ, however, these records relate primarily to counseling notes and contain no objective mental status evaluations. (Doc. 8, Tr. 23, PAGEID #: 72).

Plaintiff also received treatment during 2015 and 2016 at Lower Lights Christian Health Center. (*See generally, id.*, Tr. 510–630, PAGEID #: 559–679). These records show Plaintiff suffered from depression and anxiety related to her family disruptions. (*Id.*, Tr. 594, PAGEID #: 643). Records from early 2016 were generally consistent with prior treatment history, with reported symptom exacerbation due to situational family problems and reported improvement with medication compliance. (*See id.*, Tr. 570–88, PAGEID #: 619–37). Plaintiff's mental status exam

in 2016 notes racing thoughts and other anxiety symptoms but also expressly documented Plaintiff's inconsistent medical compliance. (*Id*., Tr. 545, PAGEID #: 614).

On April 7, 2016, treating source, Roseanne Hickman, an advanced practices registered nurse, noted that due to her diagnoses of major depressive order and PTSD, Plaintiff had not been able to work, had trouble dealing with people, and indicated that the claimant could be expected to miss multiple days of work per week on a frequent basis due to her symptoms. (*Id*., Tr. 447–49, PAGEID #: 496–98).

**D. The ALJ's Decision**

The ALJ found that Plaintiff remained insured for disability insurance benefits through March 31, 2015, and that she had not engaged in substantial gainful activity since her alleged onset date of January 1, 2013. (Doc. 8, Tr. 17, PAGEID #: 66). The ALJ determined that Plaintiff suffered from the following severe impairments: depression, anxiety, and post-traumatic stress disorder. (*Id*.). Additionally, the ALJ determined that Plaintiff suffered from non-severe impairments, including asthma, a right ankle injury, hypertension, hyperlipidemia and thyroid dysfunction, and obesity. (*Id*., Tr. 18, PAGEID #: 67). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id*., Tr. 19, PAGEID #: 68.).

Specifically, the ALJ concluded that Plaintiff's mental symptomatology did not result in at least two limitations or one extreme limitation in the areas of activities of daily living, social functioning, concentration/persistence/pace, or episodes of decompensation as required in "paragraph B" of Listing 12.04 or Listing 12.06. (*Id*., Tr. 19 PAGEID #: 68). Rather, the ALJ found Plaintiff had a "mild" limitations in her ability to remember or apply information; "moderate" difficulties interacting with others; "moderate" limitations with regard to

concentrating, persisting, or maintaining pace; and "moderate" limitations in her ability to adapt or manage herself. (*Id*.). Thus, the ALJ held that Plaintiff did not satisfy the "paragraph B" criteria. (*Id*.).

As to Plaintiff's RFC, the ALJ opined:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine, repetitive tasks in a work environment that is not fast-paced or does not have unusual production demands, defined as goal-based production or work measured by end result, not pace work. Additionally, the claimant can interact occasionally with coworkers and supervisors, and only incidental interaction with the public. Furthermore, the claimant can perform jobs where changes in job responsibilities are infrequent and any changes are explained in advance and supported by instructions or additional supervisory support.

(*Id*., Tr. 20, PAGEID #: 69). After consideration of the evidence, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id*., Tr. 24, PAGEID #: 73). The ALJ elaborated on how he reached that finding:

> In terms of the claimant's alleged mental health limitations, the record is undeniable that the claimant experienced significant period of stress, anxiety, and depression. However, the record also consistently demonstrates that resultant symptomatology from these conditions was generally related to family related factors and domestic problems as much as they were related to any underlying psychological etiology. Additionally, regular non-compliance with medication and treatment recommendations, showed additional symptom exacerbation versus periods in which the claimant was compliant. Despite the claimant's own psychological allegations and problems stemming from her family circumstances, she was able to complete her Bachelor's degree course work, which necessitated concentration on reading, writing, and other projects. Furthermore, despite her challenges, she has been able to utilize her talents to administer a social network forum utilizing art therapy to help herself and others deal with mental health symptoms. In light of the record, I have appropriately found the claimant capable of performing simple, routine, repetitive tasks with additional limitations as identified in the assessed residual functional capacity noted above.

(*Id.*, Tr. 24, PAGEID #: 73).

As for the opinion evidence, the ALJ gave "partial weight" to the State agency

8

psychological consultant assessments. (*Id.*). The ALJ more fully described how he reached this decision.

> [T]he undersigned has considered the State agency psychological consultant assessments. Initially, State agency psychological consultant Dr. Rivera, indicated that claimant would be capable of performing simple, routine tasks that involve superficial interactions with others, in a low stress environment, with no strict production quotas, is capable of comprehending remembering, and following simple 2-3 step instructions and make simple decisions, in a setting in which duties are routine and predictable. At reconsideration, State agency psychological consultant Dr. Swain, largely affirmed Dr. Rivera's assessment however additionally specified that the claimant can adapt to minor changes, with changes needing to be explained fully. I have assigned these opinions partial weight. While I agree with and have incorporated some of the language from these assessments, I have modified the non-policy compliant language as reflected in the assessed residual functional capacity above, specifically as it relates to the claimant's social functioning restrictions.

(*Id.*) (internal citations omitted).

The ALJ also assigned "partial weight" to the opinion of psychological consultative examiner, Dr. Meyer. (*Id.*, Tr. 25, PAGEID #: 74). Dr. Meyer indicated that Plaintiff is expected to be able to perform "simple and moderately complex routine instructions and tasks, in a work setting without strict production quotas or pace requirements . . . in a solitary work setting with at most only intermittent/occasional contact with supervisors and co-workers." (*Id.*). The ALJ found, however, that Dr. Meyer's opinion "vacillates between a range of capability, rather than specifically articulates the most the claimant can do given her impairments, which is inconsistent with program policy." (*Id.*). In addition, the ALJ found that Dr. Meyer's restrictions regarding a solitary work environment were "not supported by the objective record and [were] internally inconsistent with his subsequent limitation to occasional contact with supervisors and co-workers." (*Id.*). In making this determination the ALJ considered that Plaintiff "engaged in a number of social activities including interacting with family, engaging with multiple treatment sources, both her own and her children's and moderated a social networking art therapy . . ." (*Id.*).

9

Consequently, the ALJ found that "such activities do not tend to support the level of social dysfunction one would expect to see in a claimant with the limitations alleged and the social function limitations assessed by Dr. Meyer." (*Id.*).

The ALJ gave "little weight" to the treating source opinion of Ms. Hickman. (*Id.*, Tr. 25, PAGEID #: 74). Ms. Hickman indicated that Plaintiff had not been able to work, had trouble interacting with people, and could be expected to miss multiple days of work per week due to her symptoms. (*Id.*). As an initial matter, the ALJ found that Ms. Hickman was not an "acceptable medical source" under relevant Regulations. (*Id.*). The ALJ further explained his decision:

> [T]he limitations assessed by Ms. Hickman are conclusory, with no significant narrative explanation regarding the assessed limitations, and contrast sharply with the claimant's own reports of: being able to care for herself and her family; interact with various medical and legal actors; socialize with her children, boyfriend, and family; complete an education; attend church when she can; play games on her phone; utilize social media for personal and therapeutic purposes; and engage in hobbies like coloring and sewing.

(*Id.*).

Next, The ALJ assigned "little weight" to the 2015 Ohio Guidestone Intake mental status evaluation, "[t]o the extent that [it] represent[ed] an opinion regarding the claimant's functional limitations." (*Id.*). The evaluation noted major functional impairment in the areas of work occupation, family relations, social, judgment, thinking, and mood. (*Id.*). The ALJ, however, found that the assessment did not provide "a function-by-function articulation of what the claimant can still do despite her alleged impairments" but rather only "generically indicate[d] the presence of functional limitation." (*Id.*). Moreover, the ALJ found the evaluation "inconsistent with subsequent records from the same source, which showed the claimant was able to engage in job search activities including: resume preparation; job search; and interviewing; as well as the claimant's returning to school to complete her education." (*Id.*).

Finally, the ALJ assigned "little weight" to the global assessment of function ("GAF") ratings of 58 and 67. (*Id*.). The ALJ explained that "a GAF rating needs supporting evidence to be given much weight" because "[u]nless the clinician clearly explains the reasons behind the GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." (*Id*., Tr. 26, PAGEID #: 75). Further, the ALJ noted that "a GAF rating is a subjective, rather than an objective measure, and the diagnosis and assessment of a mental impairment under the criteria found in the DSM-IV are not entitled to great weight in making disability determinations." (*Id*.).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff sets forth just one error. (Doc. 10). She argues that the ALJ "erred in his treatment of State agency psychological expert opinions, failing to provide any supportable explanation for

his treatment of work preclusive social limitations." (*Id*. at 1).  More specifically, she contends that the ALJ's decision should be reversed because he did not specifically cite State agent psychologist Dr. Swain's opinion concerning Plaintiff's workplace limitations.  (Doc. 10 at 9–12; Doc. 12 at 1–2).  Dr. Swain opined that plaintiff should be limited to only superficial workplace interactions and workplace interactions in a setting with a small group of familiar others.  (Doc. 8, Tr. 121, PAGEID #: 170).

Plaintiff attempts to show the importance of Dr. Swain's work limitation by pointing to the hearing testimony, where the VE opined that a limitation to only superficial interactions would be work preclusive.  (Doc. 10 at 10).  But Plaintiff's argument misses the mark.  While it may be true that such a limitation would be work preclusive, the ALJ did not err by declining to adopt this limitation as part of his RFC.

As an initial matter, there is no "reasons-giving" requirement with regards to non-treating sources.  *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 225, 259 (6th Cir. 2016), *reh'g denied* (Sept. 20, 2016).

> Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated in Martin's RFC.  But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions.

*Id*. (internal citations omitted).  While required to develop the record fully, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Dykes ex rel. Brymer v. Barnh*art, 112 F. App'x 463, 467 (6th Cir. 2004).  *See also Hamper v. Comm'r of Soc. Sec.*, 714 F. Supp. 2d 693, 703 (E.D. Mich. 2010) (noting that an ALJ is not required to "discuss every piece of evidence in the administrative record"); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (holding that

"[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

Further, contrary to Plaintiff's argument that the ALJ erred by failing to credit Dr. Swain's opinion regarding workplace limitations, the undersigned finds substantial evidence supports the ALJ's decision. As explained above, substantial medical evidence from the record supports the ALJ's finding that Plaintiff's anxiety was situational and that her symptoms worsened when she did not comply with her medications. Further, State agency psychological consultant, Dr. Rivera, did not limit Plaintiff to only superficial work interactions, and she assessed the claimant's "paragraph B" criteria as "mild restriction in activities of daily living" and "mild difficulty in social functioning." (Doc. 8, Tr. 19, PAGEID #: 68). And, as noted in the ALJ's opinion, Plaintiff's own testimony concerning her daily activities and abilities support the ALJ's decision to limit Plaintiff to "occasional" interaction with coworkers and supervisors and "only incidental interaction with the public," rather than limiting her to a workplace environment with only "familiar" coworkers and "superficial" interactions with supervisors. (*See id.*, Tr. 24, PAGEID #: 73).

Moreover, the ALJ considered both Dr. Meyer's and Roseanne Hickman's opinions, which were arguably more restrictive than that of Dr. Swain. (*Id*., Tr. 25, PAGEID #: 74). Dr. Meyer opined that Plaintiff needed a "solitary work setting with at most only intermittent/occasional contact with supervisors and coworkers." (*Id*., Tr. 23, PAGEID #: 72; *id*., Tr. 25, PAGEID #: 74). The ALJ found, however, that Dr. Meyer's "restrictions regarding a solitary work environment [were] not supported by the objective record and [were] internally inconsistent with his subsequent limitation to occasional contact with supervisors and coworkers." (*Id*., Tr. 25, PAGEID #: 74). The ALJ also found that Dr. Meyer's restrictions were inconsistent with "claimant's own reports,"

13

specifically that "she engaged in a number of social activities including interacting with family, engaging with multiple treatment sources, both her own and her children's, and moderated a social networking art therapy forum . . ." (*Id.*).

Ms. Hickman similarly indicated that Plaintiff had trouble dealing with people and cited her poor ability to interact with others. (*Id.*). The ALJ concluded that Ms. Hickman's limitations "contrast[ed] sharply with the claimant's own reports of: being able to care for herself and her family; interact with various medical and legal actors; socialize with her children, boyfriend and family; complete an education; attend church when she can; play games on her phones . . . and engage in hobbies like coloring and sewing." (*Id.*). The ALJ, not a physician, ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Accordingly, the fact that the ALJ did not explicitly cite Dr. Swain's workplace limitation does not undermine either his RFC or his ultimate finding because he properly considered opinion evidence regarding workplace preclusions, and, in his discretion, found them inconsistent with the evidence.

Finally, the Court acknowledges that Dr. Swain's limitation arguably supports a more restrictive RFC. That, however, is not the question for this Court. *See, e.g*, *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (noting that "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference"); *Lang v. Comm'r of Soc. Sec.*, No. 1:17-cv-503, 2018 WL 3675508, at *4–7 (S.D. Ohio Aug. 2, 2018) (rejecting plaintiff's argument that the ALJ erred in limiting plaintiff's workplace environment to "occasional" contact with coworkers rather than complete elimination of any social interactions—noting plaintiff's ability to raise children as a single parent, interact with family members, grocery shop, and attend her

14

children's' events); *Keressi v. Comm'r of Soc. Sec.*, No. 15-12675, 2016 WL 4154948, at *11 (E.D. Mich. May 20, 2016), *report and recommendation adopted*, No. 15-12675, 2016 WL 4138232 (E.D. Mich. Aug. 4, 2016) (finding that, contrary to plaintiff's arguments, the record supported an RFC limiting plaintiff to "occasional" contact with coworkers rather than elimination of all interactions—citing plaintiff's ability to travel outside of the home, shop, and attend movies).

Ultimately, the Court must decide if substantial evidence supports the ALJ's conclusion, and it does. Taking into account all that the ALJ considered, substantial evidence supports his decision.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report

and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    IT IS SO ORDERED.

Date: September 10, 2018                        /s/ Kimberly A. Jolson
                                                                 KIMBERLY A. JOLSON
                                                                 UNITED STATES MAGISTRATE JUDGE